1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOSE MACIEL and ELVIS BONILLA,            No.  1:17-cv-00902-DAD-SKO
     *on behalf of themselves and all others*
12   *similarly situated, and as "aggrieved*
     *employees" on behalf of other "aggrieved*
13   *employees" under the Private Attorneys*   ORDER CONDITIONALLY GRANTING
     *General Act of 2004*,                     PLAINTIFFS' MOTION FOR
14                                              PRELIMINARY APPROVAL OF CLASS
                        Plaintiffs,            ACTION SETTLEMENT
15
          v.                                   (Doc. No. 54)
16
     BAR 20 DAIRY, LLC, *a California*
17   *limited liability company*; and DOES 1
     through 50, *inclusive*,
18
                        Defendants.
19

20

21                                  **INTRODUCTION**

22          This matter is before the court on plaintiffs' second motion for preliminary approval of

23   class action settlement.  (Doc. No. 54.)  Pursuant to General Order No. 617, which addresses the

24   public health emergency posed by the ongoing coronavirus outbreak, the court took the matter

25   under submission on April 22, 2020 to be decided on the papers.  (Doc. No. 55.)  For the reasons

26   set forth below, the court will conditionally grant plaintiffs' motion for preliminary approval of

27   class action settlement.

28   /////

                                              1

**BACKGROUND**

Defendant Bar 20 Dairy, LLC (hereinafter "Bar 20") engages in the business of dairy farming in Kerman, California.  (Doc. No. 54-1 at 14.)  Defendant employed plaintiffs Jose Maciel and Elvis Bonilla as "milkers," whose responsibilities included milking cows, monitoring the health conditions of cows, maintaining and cleaning corrals, cleaning the farm, inseminating cows, delivering calves, and assisting in defendant's veterinary clinic.  (*Id.*)

The detailed procedural history of this action was described in a previous order issued by this court and so will not be reprised here.  (*See* Doc. No. 34.)  This action now proceeds on plaintiffs' fifth amended complaint, which alleges eight causes of action under California's Labor Code, Unfair Competition Law, and Private Attorneys General Act ("PAGA"), in addition to the federal Fair Labor Standards Act ("FLSA").  (*See* Doc. No. 44.)  On April 7, 2020, following the court's rejection of the Third Amended Settlement, plaintiffs renewed their motion for preliminary approval of class action settlement.  (Doc. No. 54.)  Before addressing the motion, the court will summarize the proposed Fourth Amended Settlement (the "Settlement") now before the court.

**THE PROPOSED SETTLEMENT**

**A.      The Class**

For settlement purposes, the parties request certification of the following class (the "Class") of an estimated 297 individuals (the "Class Members"):

> [A]ll current and former non-exempt employees of Defendant employed between February 11, 2011 through May 11, 2016 ("Class Period") in the following departments and/or job categories, or any like position(s):  Breeders, Calf, Corral Maintenance, Feed Push, Feeders, Fresh Cow, Hospital, Maintenance, Waste Management, Maternity, Milkers, Farm Tractor and Equipment Drivers, Farm Irrigators, and Farm Shop.

(Doc. Nos. 54-1 at 17–18; 54-2, Ex. 1, Settlement Agreement at 55–56.)

**B.      The FLSA Collective**

Although the parties do not set out a separate definition for the FLSA Collective, Class Members can release their FLSA Claims by opting into the FLSA Settlement.  (Doc. No. 54-1 at 13.)  A Class Member can opt-in by endorsing and cashing their FLSA Settlement Check.  (*Id.*)

2

1    Only Class Members who cash their FLSA Settlement Checks will release their FLSA Claims.

2    (Settlement Agreement at 78; Doc. No. 54-2, Ex. 1, Class Notice at 90.)

3    **C.      The Class Period**

4            For settlement purposes, the parties have defined the "Class Period" as "the period of time

5    from February 11, 2011 through May 11, 2016."  (Settlement Agreement at 56; Doc. No. 54-1 at

6    17.)

7    **D.      The Release of Claims**

8            The settlement agreement defines Released Parties as:

9            Defendant Bar 20 Dairy, LLC and its present and former parent
             companies, subsidiaries, divisions, affiliates, related companies,
10           joint ventures, and each of their respective present and former
             offices, directors, shareholders, agents, employees, insurers,
11           attorneys, payroll companies, accountants, auditors, advisors,
             representatives, consultants, pension and welfare benefit plans, plan
12           fiduciaries, administrators, trustees, general and limited partners,
             predecessors, successors and assigns.  Producers Diary Foods, Inc. is
13           excluded from the definition of Released Parties.

14   (Settlement Agreement at 60; Doc. No. 54-1 at 19–20.)

15           The Released Claims are defined as:

16           [A]ny and all claims, demands, rights, debts, obligations, costs,
             expenses, wages, liquidated damages, statutory damages, penalties
17           including civil and statutory, liabilities, and/or causes of action of
             any nature and description whatsoever, whether known or unknown,
18           at law or in equity, whether concealed or hidden, whether under
             federal, state, and/or local law, statute, ordinance, regulation,
19           common law, or other source of law, which were asserted in the
             Consolidated Action against the Released Parties arising out of the
20           facts and circumstances alleged in the Consolidated Complaint
             during the Release Period.  Released Claims include, without
21           limitation, claims arising under federal, state, and/or local statutory,
             constitutional, contractual, or common law claims for wages,
22           damages, costs, penalties, liquidated damages, punitive damages,
             interest, attorney fees, litigation costs, restitution, equitable relief, or
23           other relief under California Business & Professions Code Section
             17200 *et seq.* ("Section 17200") based on the California Labor Code;
24           the Wage Orders of the California Industrial Welfare Commission;
             and Section 17200, including, but not limited to, failure to provide
25           timely, off-duty meal and/or rest breaks; failure to promptly pay all
             wages due and owing at the time of the employee's separation from
26           employment; engaging in unlawful/unfair/fraudulent business
             practices in violation of Section 17200; failure to provide accurate
27           itemized wage statements; failure to keep accurate payroll records;
             failure to pay the California or federal minimum wage; failure to pay
28           California or federal overtime; and any and all California Labor Code

provision giving rise to PAGA penalties.

(Settlement Agreement at 59; Doc. No. 54-1 at 18–19.)

In addition:

> Released Claims also include any related Fair Labor Standards Act ("FLSA") wage claims, whether known or unknown, arising for any Settlement Class Member, based on those allegations in the Consolidated Action but only for those Settlement Class Members who endorse their FLSA Settlement Checks (see Section VII, paragraph 2) by signing under the pre-printed language under each FLSA Settlement Check: "By signing, endorsing, depositing, cashing, and/or negotiating this check, I hereby "opt in" to the Settlement and release all claims pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b) et seq." Settlement Class Members will release the FLSA claim only if they opt in by cashing, depositing or otherwise negotiating their FLSA Settlement Checks.

(Settlement Agreement at 59–60; Doc. No. 54-1 at 19.)

**E.      Summary of the Settlement Terms**

Under the proposed Settlement, defendants will pay a total of $450,000.00 (the "Gross Settlement Amount"), allocated as follows:  1) up to $150,000.00 (or 33.33%) for attorneys' fees and up to $25,000.00 (or 5.56%) for attorneys' costs; 2) $7,500.00 each in incentive awards for plaintiffs Maciel and Bonilla, for a total of $15,000.00 (or 3.33%); 3) $5,000.00 (or 1.11%) in civil PAGA penalties;[1] and 4) an estimated $6,500.00 (or 1.44%) for settlement administration costs.  (Settlement Agreement at 65–69; Doc. No. 54-1 at 18–21.)

Assuming these allocations are awarded in full, approximately $249,750.00 (the "Net Settlement Amount"), will be available for distribution to Class Members who do not submit a timely and valid Opt-Out Request ("Class Claimants") and who timely and validly opt-in to the release of the FLSA Claims.[2]  (*Id.*)  From the Net Settlement Amount, 90% will be allocated to settle the Class Claims, and 10% to the FLSA Claims.  (Settlement Agreement at 67, 74; Class Notice at 90; Doc. No. 54-1 at 20–21.)  The Net Settlement Amount will be distributed on a

---

[1]  Pursuant to the PAGA, 75% of the civil PAGA penalties, or $3,750.00, will go to the California Labor and Workforce Development Agency ("LWDA"), and 25%, or $1,250, will be reserved for the Net Settlement Amount.  (Settlement Agreement at 73.)  *See also* Cal. Lab. Code § 2699(i).

[2]  As noted above, Class Claimants need only cash their FLSA Settlement Check to opt-in to the FLSA Settlement.  (Settlement Agreement at 78; Class Notice at 90.)

4

proportional basis based on the number of pay periods worked by each Class Member. (*Id.*)

Plaintiffs estimate that the average Class Claimant will receive $840.90 ($249,750 Net Settlement

Amount divided by the estimated 297 Class Members); the minimum paid to each Class Claimant

will be no less than $100.00. (Settlement Agreement at 58; Class Notice at 90; Doc. No. 54-1 at

21.) In response to the court's concerns regarding the Third Amended Settlement's reversionary

aspect, the Settlement has now been changed to be non-reversionary so that no funds will revert

to defendant. (Doc. No. 54-1 at 13.) Any settlement checks that are not cashed before their

expiration will be voided with the funds to be transmitted to Legal Aid at Work, formerly the

Legal Aid Society – Employment Law Center. (*Id.* at 22.)

## LEGAL STANDARDS

### A.    Rule 23 Settlements

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a

certified class may be settled, voluntarily dismissed, or compromised only with the court's

approval." The following procedures apply to the court's review of the proposed settlement:

> The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> . . .
>
> Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

*Id.*

"Courts have long recognized that settlement class actions present unique due process

concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935,

946 (9th Cir. 2011) (internal quotation marks and citations omitted). To protect the rights of

absent class members, Rule 23(e) requires that the court approve all class action settlements "only

after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate."

1   *Id.* at 946.  But when parties seek approval of a settlement agreement negotiated before formal

2   class certification, "there is an even greater potential for a breach of fiduciary duty owed the class

3   during settlement."  *Id.*  In such circumstances, "settlement approval requires a higher standard of

4   fairness" and a "more exacting review" so as "to ensure that class representatives and their

5   counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who

6   class counsel had a duty to represent."  *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012)

7   (internal quotation marks and citations omitted).  In addition, when parties seek class certification

8   only for purposes of settlement, Rule 23 "demand[s] undiluted, even heightened, attention" to the

9   certification requirements.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  The

10  district court must examine the propriety of certification under Rule 23 both at this preliminary

11  stage and at a later fairness hearing.  *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D.

12  Cal. Oct. 2, 2014).

13      Review of a proposed class action settlement ordinarily proceeds in three stages.  *See*

14  *Manual for Complex Litigation* (4th) § 21.632.  First, the court conducts a preliminary fairness

15  evaluation and, if applicable, considers class certification.  *Id.* (noting that if the parties move for

16  both class certification and preliminary approval, the certification hearing and preliminary

17  fairness evaluation can usually be combined).  Second, if the court makes a preliminary

18  determination on the fairness, reasonableness, and adequacy of the settlement terms, the parties

19  are directed to prepare and issue the notice of certification and proposed settlement to the class

20  members.  *Id.*  Third, the court holds a final fairness hearing to determine whether to approve the

21  settlement.  *Id.*; *see also Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1267

22  (9th Cir. 2010).

23      Though Rule 23 does not explicitly provide for such a procedure, federal courts generally

24  grant preliminary approval if "the proposed settlement appears to be the product of serious,

25  informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant

26  preferential treatment to class representatives or segments of the class, and falls within the range

27  of possible approval."  *Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL

28  558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp.

2d 1078, 1079 (N.D. Cal. 2007)); *see also Newberg on Class Actions* § 13:13 (5th ed. 2011). While it is not a court's province to "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute," a court should weigh, among other factors, the strength of a plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the extent of discovery completed; and the value of the settlement offer. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964–67 (9th Cir. 2009) (quoting *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

### B.    PAGA Settlements

Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of herself and other current or former employees. Cal. Lab. Code § 2699(a).[3] A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009). Accordingly, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.*; *see also Iskanian v. CLS Transp. L.A., LLC*, 59 Cal. 4th 348, 381 (2014) ("When a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as though the person were a party.").

The PAGA statute imposes a number of limits on litigants. First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims. *Iskanian*, 59 Cal. 4th at 381*; ZB, N.A. v. Superior Court*, 8 Cal. 5th 175 (2019)*.* Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the employer. Cal. Lab. Code § 2699.3(a)(1). Third, any civil penalties recovered must be divided 75% with the LWDA

---

[3] An "aggrieved employee" is defined as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

1    and 25% with the aggrieved employees. *Id.* at § 2699(i). Finally, the proposed settlement must

2    be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA

3    claims. *Id.* at § 2699(l)(2). Although there is no binding authority setting forth the proper

4    standard of review for PAGA settlements, courts, in the class action context where PAGA claims

5    often appear, must independently determine that a proposed settlement agreement is

6    "fundamentally fair, adequate and reasonable" before granting approval. *See In re Heritage Bond*

7    *Litig.*, 546 F.3d 667, 674–75 (9th Cir. 2008). The determination of fairness, reasonableness, and

8    adequacy may involve a balancing of several factors including but not limited to the following:

9    the strength of plaintiffs' claims; the risk, expense, complexity, and likely duration of further

10    litigation; the amount offered in settlement; the extent of discovery completed, and the stage of

11    the proceedings; and the experience and views of counsel. *See Officers for Justice*, 688 F.2d at

12    625.

13          The LWDA has also provided some guidance regarding court approval of PAGA

14    settlements. In a case where both class action and PAGA claims were covered by a proposed

15    settlement, the LWDA stressed that

16
17
18
19
> when a PAGA claim is settled, the relief provided for under the PAGA [must] be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court [must] evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

20    California Labor and Workforce Development Agency's Comments on Proposed PAGA

21    Settlement ("LWDA Letter"), *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC (N.D.

22    Cal. Jul. 29, 2016) (Doc. No. 736 at 2–3);[4] *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110,

23    1133 (N.D. Cal. 2016) (citing the LWDA Letter with approval).

24          Recognizing the distinct issues presented by class actions, this court is persuaded by the

25    LWDA's reasoning in *O'Connor* and therefore adopts its proposed standard in evaluating the

26

27
28
---
[4] In the LWDA Letter, the LWDA also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action."

1   PAGA portion of the settlement now before the court.  *See, e.g.*, *Castro v. Paragon Indus., Inc.*,

2   No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *Patel v. Nike*

3   *Retail Servs., Inc.*, No. 14-cv-04781-RS, 2019 WL 2029061, at *2 (N.D. Cal. May 8, 2019).

4   Accordingly, the court will approve a settlement of PAGA claims upon a showing that the

5   settlement terms 1) meet the statutory requirements set forth by PAGA, and 2) are fundamentally

6   fair, reasonable, and adequate in view of PAGA's public policy goals.

7   **C.**   **FLSA Settlements**

8         The FLSA permits employees to file civil actions against employers who abridge the

9   FLSA's guarantees.  29 U.S.C. § 216(b); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S.

10   66, 69 (2013) ("The FLSA establishes federal minimum-wage, maximum-hour, and overtime

11   guarantees that cannot be modified by contract.").  Employees may bring collective actions under

12   the FLSA, representing all "similarly situated" employees, but "each employee [must] opt-in to

13   the suit by filing a consent to sue with the district court."  *Does I thru XXIII v. Advanced Textile*

14   *Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000).  Because an employee cannot waive claims under the

15   FLSA, the claims may not be settled without court approval or Department of Labor supervision.

16   *See Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO, 2018 WL 1305713, at *1

17   (E.D. Cal. Mar. 13, 2018) (citing *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740

18   (1981)).  The decision to certify an FLSA collective action is within the discretion of the district

19   court.  *See Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).

20         Although the Ninth Circuit has not established criteria to evaluate FLSA settlements,

21   district courts in this circuit routinely apply the standard employed in the Eleventh Circuit, which

22   examines whether a settlement is a fair and reasonable resolution of a bona fide dispute.  *See, e.g.*,

23   *Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (citing

24   *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352–53 (11th Cir. 1982)); *Nen Thio v.*

25   *Genji, LLC*, 14 F. Supp. 3d 1324, 1333 (N.D. Cal. 2014) (same).  "A bona fide dispute exists

26   when there are legitimate questions about the existence and extent of defendant's FLSA liability."

27   *Kerzich v. Cty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018) (citation omitted).  A

28   court will not approve a settlement when there is certainty that the FLSA entitles plaintiffs to the

9

1  compensation they seek because doing so would shield employers from the full cost of complying

2  with the statute.  *Id.*

3        If a bona fide dispute between the parties exists, "[c]ourts often apply the Rule 23 factors

4  in evaluating the fairness of an FLSA settlement, while recognizing that some do not apply

5  because of the inherent differences between class actions and FLSA actions." *Khanna v. Inter-*

6  *Con Sec. Sys., Inc.*, No. 2:09-cv-02214-KJM-EFB, 2013 WL 1193485, at *2 (E.D. Cal. Mar. 22,

7  2013) (internal quotation marks and citations omitted).  The factors include

8
9
10
11
> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

12  *Castro*, 2020 WL 1984240, at *6 (citation omitted).

13        District courts in this circuit have also taken note of the "unique importance of the

14  substantive labor rights involved" in settling FLSA actions and adopted a "totality of

15  circumstances approach that emphasizes the context of the case." *Selk*, 159 F. Supp. 3d at 1173.

16  Under this approach, a "district court must ultimately be satisfied that the settlement's overall

17  effect is to vindicate, rather than frustrate, the purposes of the FLSA." *Id.*  In connection with this

18  approach, the district court's "obligation is not to act as caretaker but as gatekeeper, so that FLSA

19  settlements do not undermine the Act's purposes." *Kerzich*, 335 F. Supp. 3d at 1185 (citation

20  omitted).  Thus, only settlements that reflect a fair and reasonable compromise of issues actually

21  in dispute may be approved by the court.  *Id.* (citation omitted).

22  **LEGAL ANALYSIS**

23        The Fourth Amended Settlement now proposed by the parties corrects some of the

24  deficiencies identified by the court in its previous order denying preliminary approval of

25  plaintiff's Third Amended Settlement.  (*See* Doc. No. 34.)  For example:  (1) the Settlement is

26  now non-reversionary and 100% of the Net Settlement Amount will be distributed among

27  Settlement Class Members; (2) the Settlement is now an "opt-out" settlement for the Rule 23

28  Claims and an "opt-in" settlement for the FLSA Claim, and the Class Notice clarifies this

distinction; and (3) the Settlement now specifically excludes Producers Dairy Foods, Inc. as one of the Released Parties.  (Doc. No. 54-1 at 13–14.)  Due to these changes, and for the reasons stated below, the court will conditionally grant plaintiffs' motion for preliminary approval of the Settlement, subject to the conditions stated below.

### A.        Preliminary Class Certification

The class action is a procedural mechanism whereby the "usual rule that litigation be conducted by and on behalf of the named parties only" is swept aside so that multiple parties— unwieldy in number but possessing similar or identical claims—may pursue common redress in an efficient and economical manner.  *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted).  Here, the parties seek preliminary certification of the proposed class under Federal Rule of Civil Procedure 23, which governs class certification and imposes a two-step process in deciding whether a class may be certified.

First, Rule 23(a) requires the moving party to demonstrate the existence of four prerequisites:  (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.  *See Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 730 (9th Cir. 2007).  If, and only if, a putative class satisfies these four requirements may it then proceed to show it also satisfies the requirements of Rule 23(b).  The party seeking class certification bears the burden of establishing conformity with these two rules and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted.  *Comcast*, 569 U.S. at 33.  Only after conducting a "rigorous analysis" of these facts and determining they show "actual, [and] not presumed, conformance" with Rule 23(a) and (b), may a district court certify a class.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citation omitted); *see also Patel v. Nike Retail Servs., Inc.*, Case No. 14-cv-4781-RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b).").  If a court decides to certify a class, it must define the class claims and issues and appoint class counsel.  Fed. R. Civ. P. 23(c)(1), (g).

/////

/////

/////

1          1.     Rule 23(a) Requirements

2                 a.     *Numerosity*

3          A proposed class must be "so numerous that joinder of all members is impracticable."

4    Fed. R. Civ. P. 23(a)(1).  The numerosity requirement demands "examination of the specific facts

5    of each case and imposes no absolute limitations."  *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S.

6    318, 330 (1980).  Courts have found the requirement satisfied when the class comprises as few as

7    thirty-nine members or where joining all class members would serve only to impose financial

8    burdens and clog the court's docket.  *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474

9    (E.D. Cal. 2010) (citation omitted) (discussing Ninth Circuit thresholds for numerosity and listing

10   cases).  Here, plaintiffs estimate that there are approximately 297 members in the settlement class.

11   (Doc. No. 54-1 at 24.)  This showing with respect to numerosity is adequate to meet the

12   requirements of Rule 23(a)(1).

13                b.     *Commonality*

14         Rule 23(a) also requires "questions of law or fact common to the class."  Fed. R. Civ. P.

15   23(a)(2).  To satisfy the commonality requirement, the class representatives must demonstrate

16   that common points of facts and law will drive or resolve the litigation.  *See Wal-Mart Stores,*

17   *Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  "[C]ommonality requires that the class members' claims

18   depend upon a common contention such that determination of its truth or falsity will resolve an

19   issue that is central to the validity of each claim in one stroke," and the "plaintiff must

20   demonstrate the capacity of classwide proceedings to generate common answers to common

21   questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda*

22   *Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350).  For example,

23   "[c]ommonality is generally satisfied where the lawsuit challenges a system-wide practice or

24   policy that affects all of the putative class members."  *Benitez v. W. Milling, LLC*, No. 1:18-cv-

25   01484-SKO, 2020 WL 309200, at *5 (E.D. Cal. Jan. 21, 2020) (internal quotation marks and

26   citations omitted).

27         The rule does not require all questions of law or fact to be common to every single class

28   member and "[d]issimilarities among class members do not [necessarily] impede the generation

                                                      12

1     of common answers to those questions[.]" *Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014);

2     *see also Hanlon*, 150 F.3d at 1019 (noting that commonality can be found through "[t]he

3     existence of shared legal issues with divergent factual predicates").  However, the raising of

4     merely any common question does not suffice.  *See Wal-Mart*, 564 U.S. at 349 ("Any

5     competently crafted class complaint literally raises common 'questions.'") (quoting Richard A.

6     Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–32

7     (2009)).

8              Here, plaintiffs contend that

9              as a result of working for the same employer in hourly-paid and
              salaried, non-exempt positions while being subject to the same
10             general wage and hour policies, Class Members share claims that call
              for the resolution of common legal and factual questions.  These
11             include, but are not limited to:

12             •   Whether Defendant failed to pay wages and/or overtime
                  compensation as required by Labor Code §§ 1194 and 1199
13                as well as Wage Order 14-2001;

14             •   Whether Defendant failed to provide lawfully required meal
                  periods and/or failed to compensate employees one (1) hour's
15                wages in lieu thereof;

16             •   Whether Defendant failed to provide lawfully required rest
                  periods and/or failed to compensate employees one (1) hour's
17                wages in lieu thereof;

18             •   Whether Defendant violated §§ 201-203 by failing to pay
                  compensation due and owning upon termination of
19                employment;

20             •   Whether Defendant engaged in unfair competition; and

21             •   Whether Defendant violated § 2699, *et seq.* of the Labor
                  Code by engaging in the acts previously alleged.
22

23     (Doc. No. 54-1 at 24.)

24            Because the above issues "would form the basis of each [] plaintiff's claims," the court

25     finds that commonality is satisfied here.  *See Bykov v. DC Transp. Servs.*, Inc., No. 2:18-cv-

26     01691-DB, 2019 WL 1430984, at *3 (E.D. Cal. Mar. 29, 2019) (citation omitted).

27     /////

28     /////

13

c.      *Typicality*

"The typicality requirement looks to whether the claims of the class representatives are typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal quotation marks omitted); Fed. R. Civ. P. 23(a)(3).  While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992).

Here, plaintiffs "worked as non-exempt and hourly employees for Defendant," and, "like absent Class Members and aggrieved employees[,] were subject to the same overtime, wage payment, meal period, and rest break period policies."  (Doc. No. 54-1 at 26.)  In addition, plaintiffs "held several positions during their employment and Defendant cross-trained them to perform different types of work."  (*Id.*)  As defendant's employer handbook explains, "Because we want to provide as much continual employment as possible for everyone working here, employees may be required to do any number of jobs other than what is described for their basic classification.  Employees may be assigned to help out with any other activity we have."  (*Id.* at 26–27.)  This handbook, which is available in both English and Spanish, is given to all of defendant's employees and advises them of defendant's policies and practices as to timekeeping, work hours, payroll, and meal and rest periods.  (*Id.* at 26.)  These policies applied to all of defendant's employees regardless of their job title.  (*Id.*)  Plaintiffs allege that these policies required them to:  "(1) work without all wages earned; (2) work without meal periods as required by law; (3) work without being provided rest periods as required by law; and (4) accept inaccurate itemized wage statements that fail to show the number of hours worked and the applicable hourly rates in effect," and that their claims are therefore typical of those alleged for the Class Members.  (*Id.* at 27.)  Due to these similarities, plaintiffs also contend that their claims could be subject to the same affirmative defenses as the claims brought on behalf of the Class Members.  (*Id.*)

1     Because the proposed class consists of workers who, like plaintiffs, were employed by

2     defendant in California and were allegedly subject to the same common, uniform, and systematic

3     set of practices described above, the court finds that the claims brought by plaintiffs Maciel and

4     Bonilla are "reasonably co-extensive with those of absent class members," *Hanlon*, 150 F.3d at

5     1020, and are likely subject to the same affirmative defenses.  Typicality is therefore satisfied

6     here.

7                    a.  *Adequacy of Representation*

8     The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

9     adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Resolution of this issue

10    requires the court to address the following questions:  "(a) do the named plaintiffs and their

11    counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

12    and their counsel prosecute the action vigorously on behalf of the class?"  *Sali v. Corona Reg'l*

13    *Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018), *cert. dismissed*, 139 S. Ct. 1651 (2019) (citation

14    omitted); *see also Pierce v. Cty. of Orange*, 526 F.3d 1190, 1202 (9th Cir. 2008).  "Adequacy of

15    representation also depends on the qualifications of counsel."  *Sali*, 909 F.3d at 1007 (citation

16    omitted).

17    Here, plaintiffs Maciel and Bonilla represent that they are adequate class representatives

18    because they have thus far "diligently, adequately[,] and fairly represented the Class and have not

19    placed their interests above any member of the Class."  (Doc. No. 54-2, Ex. 27, Maciel Decl. at

20    454–56; Ex. 28, Bonilla Decl. at 464–66.)  Plaintiffs also aver that they have no conflicts of

21    interest with the absent Class Members, and that, by serving as class representatives and retaining

22    qualified class counsel experienced in prosecuting wage and hour class actions, they have

23    "demonstrate[d] their commitment to bringing about the best possible results for the benefit of the

24    proposed Class[]."  (*Id.*)  Finally, plaintiffs' counsel affirm that plaintiffs Maciel and Bonilla have

25    provided them "with all necessary and pertinent information" and "participated in the full-day

26    mediation in this matter and were informed of all of the Settlement negotiations."  (Doc. No. 54-1

27    at 28.)

28    /////

15

1    Plaintiffs' counsel have also submitted declarations to establish their adequacy as Class

2    Counsel.  (*See* Doc. No. 54-2, Spivak Decl. at 1–46; Ex. 37, Kingsley Decl. at 619–26.)  Attorney

3    David Spivak has approximately 25 years of litigation experience in both state and federal court,

4    almost exclusively in employment law and related class actions.  (Spivak Decl. at 15–21.)

5    Attorney Eric Kingsley has at least 20 years of litigation experience, and his practice focuses on

6    wage and hour and working condition class actions.  (Kingsley Decl. at 622–24.)  Both attorneys

7    aver that they have no conflicts of interest with the absent Class Members.  (Doc. No. 54-1 at 27.)

8    As such, the court finds that plaintiffs and their counsel satisfy the adequacy of representation

9    requirement.

10              2.       Rule 23(b)(3) Requirements

11    The parties seek class certification under Rule 23(b)(3), which requires that:  (1) the

12    questions of law or fact common to class members predominate over any questions affecting only

13    individual members; and (2) a class action be superior to other available methods for fairly and

14    efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615; *In re Hyundai and Kia

15    Fuel Economy Litigation*, 926 F.3d 539, 556 (9th Cir. 2019) (en banc).  The test of Rule 23(b)(3)

16    is "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617

17    F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

18              a.       *Predominance*

19    First, common questions must "predominate" over any individual questions.  While this

20    requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is higher at this

21    stage of analysis.  *Dukes*, 564 U.S. at 359.  While Rule 23(a)(2) can be satisfied by even a single

22    question, Rule 23(b)(3) requires convincing proof that common questions "predominate."

23    *Amchem*, 521 U.S. at 623–24.  "When common questions present a significant aspect of the case

24    and can be resolved for all members of the class in a single adjudication, there is clear

25    justification for handling the dispute on a representative rather than on an individual basis."

26    *Hanlon*, 150 F.3d at 1022.

27    As discussed above, plaintiffs challenge defendant's uniform "overtime, wage payment,

28    meal period, and rest break period policies," which allegedly deprived Class Members of

16

1   statutorily required meal and rest periods and compensation for hours worked.  (Doc. No. 54-1 at

2   28–29.)  Class actions in which a defendant's uniform policies are challenged generally satisfy

3   the predominance requirement of Rule 23(b)(3).  *See, e.g.*, *Castro*, 2020 WL 1984240, at *6;

4   *Palacios v. Penny Newman Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB, 2015 WL 4078135,

5   at *5–6 (E.D. Cal. July 6, 2015).  The court therefore concludes that the predominance

6   requirement has been met in this case.

7                      b.      *Superiority*

8          Rule 23(b)(3) also requires a court to find that "a class action is superior to other available

9   methods for the fair adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  To resolve the

10  Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing

11  separate actions individually, any litigation already in progress involving the same controversy,

12  the desirability of concentrating in one forum, and potential difficulties in managing the class

13  action—although the last two considerations are not relevant in the settlement context."  *See*

14  *Palacios*, 2015 WL 4078135, at *6 (citing *Schiller v. David's Bridal Inc.*, No. 10-cv-00616-AWI-

15  SKO, 2012 WL 2117001, at *10 (E.D. Cal. June 11, 2012)).

16         Here, plaintiffs assert that the superiority requirement is satisfied because the alternative

17  method of resolution—individual suits by the 297 class members with relatively modest claims

18  and limited resources—would be prohibitively expensive, inefficient, and uneconomical for

19  potential plaintiffs.  (Doc. No. 54-1 at 29.)  *See also Local Joint Exec. Bd. of Culinary/Bartender*

20  *Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("If plaintiffs cannot

21  proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the

22  disparity between their litigation costs and what they hope to recover.").  In addition, litigating

23  such claims individually in the highly impacted U.S. District Court for the Eastern District of

24  California[5] "would be inefficient and would unnecessarily burden the judicial system" and could

25  result in inconsistent outcomes.  *Cortez v. Vieira Custom Chopping, Inc.*, No. 1:17-cv-01647-

26  DAD-SKO, 2019 WL 4596782, at *6 (E.D. Cal. Sept. 23, 2019).

27  /////

28  _____

[5]  *See* Doc. No. 50 for a description of the ongoing judicial emergency in this district court.

Given that "[a] common nucleus of facts and potential legal remedies" predominate, the court finds that these questions can be resolved for all members more efficiently and expeditiously in a single action. *Hanlon*, 150 F.3d at 1022. Therefore, the court is satisfied that the superiority requirement has been met here.

**B.      Conditional Certification of FLSA Collective Action**

Plaintiffs seeking conditional certification of a collective action under the FLSA have the burden to show that they are "similarly situated" to other employee class members. *Nen Thio*, 14 F. Supp. 3d at 1340. Plaintiffs can show they are "similarly situated by making substantial allegations, supported by declarations or discovery, that the putative class members were together the victims of a single decision, policy, or plan." *Rodriguez v. Danell Custom Harvesting, LLC*, 293 F. Supp. 3d 1117, 1130 (E.D. Cal. 2018) (quoting *Nen Thio*, 14 F. Supp. 3d at 1340) (internal quotation marks omitted). Courts apply a lenient standard when determining whether to conditionally certify a collective. *See Syed v. M-I, LLC*, No. 1:12-cv-01718-AWI-MJS, 2014 WL 6685966, at *2 (E.D. Cal. Nov. 26, 2014). Here, plaintiffs contend that the members of the proposed FLSA collective action are similarly situated because they "work[ed] for the same employer in the [same] hourly-paid and salaried, non-exempt positions while being subject to the same general wage and hour policies," causing them to "suffer[] the same alleged violations" of the FLSA. (Doc. No. 54-1 at 24, 30.)

For all the reasons these groups satisfy the requirements for preliminary certification under Rule 23, the proposed certification of a collective action under the FLSA also satisfies the FLSA's less stringent requirement that the members be "similarly situated." Conditional certification of this FLSA collective is therefore appropriate.

**C.      Preliminary Settlement Approval**

Plaintiffs also seek preliminary approval of the Settlement. Because the Settlement has PAGA and FLSA components, it must meet certain requirements under those acts. In addition, under Rule 23(e), a court may approve a class action settlement only if it is a fair, reasonable, and adequate resolution of the dispute. *Bluetooth*, 654 F.3d at 946. "[P]reliminary approval of a settlement has both a procedural and substantive component" and is appropriate if: (1) the

18

1  proposed settlement appears to be the product of serious, informed, non-collusive negotiations;

2  and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and

3  does not improperly grant preferential treatment to class representatives or segments of the class.

4  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citation omitted).

5            1.     The PAGA Component

6         PAGA requires that a proposed settlement be submitted to the LWDA.  Cal Lab. Code §

7  2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal.

8  2019) (noting that a proposed settlement should be submitted to the LWDA to allow it to

9  comment if it so desires (citing *Ramirez v. Benito Valley Farms, LLC*, No. 16-cv-04708-LHK,

10  2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017))).

11         Here, plaintiffs have failed to demonstrate that they submitted the Settlement to the

12  LWDA to allow it to comment.  Accordingly, the court directs the parties to submit the

13  Settlement—with the changes ordered below—to the LWDA for its review.  In the interim, the

14  court will address the fairness, reasonableness, and adequacy of the PAGA penalties below.

15            2.     The FLSA Component

16         The court noted in its previous order that, as things stood at that time, there "appear[ed] to

17  be no bona fide dispute about FLSA liability:  instead, by assigning no value to the FLSA claim,

18  plaintiffs appear to effectively concede that defendant is not liable under the FLSA."  (Doc. No.

19  34 at 12.)

20         To address the court's concerns, the parties agreed to the following two provisions.  First,

21  they have agreed to allocate 10% of the Net Settlement Amount, or $24,975.00, to settle the

22  FLSA Claims.  (Settlement Agreement at 67, 74; Class Notice at 90; Doc. No. 54-1 at 20–21.)

23  Second, in recognition of the value of the FLSA Claims, the parties have renegotiated to eliminate

24  the reversionary aspect of the Settlement.[6]  (*See* Doc. No. 54-1 at 36–37.)

25         Moreover, the parties now explicitly note the "highly contested nature of the proceedings

26  and the absence of clear case law," including (1) whether "the alleged failure to pay overtime was

27  _____

28  [6]  The parties, however, did not increase the overall value of the Settlement pursuant to their renegotiation of the agreement.

1   related to the issuance of discretionary bonuses," which, if so, would "not increase the regular

2   rate of pay for purposes of overtime wages"; (2) whether employees "often work[ed] shifts in

3   excess of ten hours," as "Wage Order 14 only requires overtime wages for work in excess of ten

4   hours per day"; and (3) whether defendant paid plaintiffs and Class Members for any overtime

5   wages they had earned in the form of "'Extra Days,' 'Misc Pay,' and 'Incentive' pay." (Doc. No.

6   54-1 at 33–37.)

7        Given these disputes over issues of fact and law, the court is now satisfied that a bona fide

8   dispute exists in this case. *See Nen Thio*, 14 F. Supp. 3d at 1340 (noting that a bona fide dispute

9   can exist over issues such as the "computation of back wage") (quoting *Yue Zhou v. Wang's Rest.*,

10  No. 05-cv-0279-PVT, 2007 WL 2298046, at *1 (N.D. Cal. Aug. 8, 2007)); *McKeen-Chaplin v.*

11  *Franklin Am. Mortg. Co.*, No. 10-cv-5243-SBA, 2012 WL 6629608, at *2 (N.D. Cal. Dec. 19,

12  2012) (finding a bona fide dispute in part because of disputes over the proper measure of damages

13  and the amount of overtime hours that the plaintiffs actually worked). Accordingly, the court will

14  proceed to evaluate the fairness of the proposed settlement of the FLSA claims.

15       3.   Procedural Fairness

16       The court must then consider whether the process by which the parties arrived at the

17  settlement is the product of arm's-length bargaining, rather than collusion or fraud. *See Millan v.*

18  *Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015). A settlement is presumed fair

19  if it "follow[s] sufficient discovery and genuine arm's-length negotiation." *Adoma v. Univ. of*

20  *Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012) (citation omitted). In addition, participation

21  in mediation "tends to support the conclusion that the settlement process was not collusive."

22  *Palacios*, 2015 WL 4078135, at *8 (citation omitted).

23       Here, after nine months of litigation, the parties entered into a global mediation with the

24  Honorable Howard R. Broadman (Ret.) on November 9, 2015, during which they successfully

25  reached a settlement. (Doc. No. 54-1 at 15–16.) As a part of the mediation, defendant informally

26  produced over 5,000 pages of documents and data (including 3,000 pages of timecard records and

27  2,000 pages of wage statements), which contained information relating to 83% of the Class

28  Members. (Doc. No. 54-2 at 632.) Aaron Woolfson, an expert hired by plaintiffs, used this data

1    to produce an analysis for the "frequency of shift lengths and presumptive meal period

2    violations." (*Id.* at 6; Exs. 14–15, Woolfson Decls. at 256–85.)  Plaintiffs' counsel then

3    calculated a damages estimate using the data produced by defendant and the analysis conducted

4    by Woolfson. (Doc. No. 54-1 at 15–16.)  The discovery conducted and the presumptive damages

5    calculated allowed the parties to "reliably assess the merits of the Parties' respective positions and

6    to compromise the issues on a fair and equitable basis." (*Id.* at 63–64.)  In sum, plaintiffs and

7    their counsel assert that the settlement was reached after extensive, good faith, arm's-length

8    negotiations. (Doc. No. 54-2 at 24.)

9        Based on these representations by the parties, the court concludes that the parties'

10   negotiation constituted genuine, informed, and arm's-length bargaining.

11       4.   Substantive Fairness

12            a.   *Adequacy of the Settlement Amount*

13       To evaluate the fairness of the settlement award, the court should "compare the terms of

14   the compromise with the likely rewards of litigation." *Campbell v. Facebook, Inc.*, 951 F.3d

15   1106, 1123 (9th Cir. 2020) (citation omitted).  "It is well-settled law that a cash settlement

16   amounting to only a fraction of the potential recovery does not per se render the settlement

17   inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as*

18   *amended* (June 19, 2000) (citation omitted).  To determine whether a settlement "falls within the

19   range of possible approval," a court must focus on "substantive fairness and adequacy" and

20   "consider plaintiffs' expected recovery balanced against the value of the settlement offer."

21   *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080.

22       The parties in this case have agreed to a $450,000.00 Gross Settlement. (Doc. No. 54-1 at

23   18–21.)  Assuming the various allocations described earlier in this order are awarded in full, the

24   Net Settlement Amount will be $249,750.00. (*Id.*)  Of that, 90% will be allocated to settle the

25   Class Claims, and 10%, to the FLSA Claims. (*Id.* at 20–21.)  The entire Net Settlement Amount

26   will be distributed to the Class Members on a proportional and non-reversionary basis, with any

27   uncashed funds to be donated to Legal Aid at Work, formerly the Legal Aid Society –

28   Employment Law Center. (*Id.* at 20–22.)

Plaintiffs estimate that the maximum potential damages for unpaid wages in this case are approximately $3,400,000.00, that the maximum statutory penalties are under $800,000.00, and that the maximum discretionary civil penalties are approximately $4,200,000.00, for a total maximum possible recovery of $8,400,000.00.[7]  (Spivak Decl. at 25.)  The Gross Settlement Amount of $450,000.00 therefore represents an approximately five percent recovery of the theoretical maximum of $8,400,000.00.  (*See* Doc. No. 19 at ¶ 27.)  This settlement amount is within the range of the percentage recoveries that California district courts—including this one—have found to be reasonable, though it is certainly on the low end of that range.  *See, e.g.*, *Singh v. Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 2412325, at *7 (E.D. Cal. May 29, 2018), *modified*, No. 1:15-cv-01497-DAD-BAM, 2018 WL 4382202 (E.D. Cal. Sept. 13, 2018) (approving a settlement of about 12% of the estimated maximum damages); *In re Toys R Us-Delaware, Inc.-Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 454 (C.D. Cal. 2014) (approving a settlement of about 5–30% of the estimated maximum); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement of about 9% of the estimated maximum).  In addition, the recovery is allocated such that Class Members will receive awards proportional to the number of pay periods that they worked.  (Doc. No. 54-1 at 20–21.)

Plaintiffs assert that the Settlement's recovery rate is appropriate and fair for several reasons.  (*See* Doc. No. 54-1 at 33–37.)  First, the settlement fund was determined only after conducting "substantial informal discovery," including over 5,000 pages of discovery and nine months of litigation.  (*See* Doc. Nos. 54-1 at 15–16; 54-2 at 632.)  This allowed the parties to calculate a maximum recovery of $8,400,000.00, which was then discounted, taking into account several factors including:  (1) "the expense and delay of continued lengthy proceedings necessary to prosecute" this action; (2) "the uncertain outcome of the litigation" and the "risk of continued

---

[7]  Counsel is directed to, in the future, detail and summarize quantitative data using clearly organized tables, charts, graphs, etc., that would permit the court to easily verify counsel's assertions.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1204 n.4 (9th Cir. 2013) (noting that district courts can order parties to re-format and re-submit records in a more usable format).

litigation in complex actions such as this"; (3) "the potential difficulty of obtaining certification"; (4) "the potential problems of proof relating to, and possible defenses to, the claims" alleged by plaintiffs; and (5) the disputed issues of both fact and law noted above. (Doc. No. 54-1 at 33–37.) Second, the allocation formula employed here is fair because each Class Member is allocated a payout that scales directly with the number of pay periods they worked, and any Class Member may dispute the number of pay periods credited to them. (*Id.* at 20–21.) Finally, plaintiffs' counsel aver that the Settlement "reflects a fair, adequate, and reasonable compromise based on Defendant's estimated liability exposure compared to the risks of continued litigation." (Spivak Decl. at 24.) The court also notes that the amount that the average Class Member can expect to receive under the Settlement is $840.90, and that the minimum paid to each Class Member will be $100.00. (Settlement Agreement at 58; Class Notice at 90; Doc. No. 54-1 at 21.) This is significant given that Class Members have an average hourly rate of pay of $10.19, with most earning between $8.00 and $12.40 an hour. (Spivak Decl. at 45; Doc. No 54-2 at 253.) *See also Gonzalez v. CoreCivic of Tenn., LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *11 (E.D. Cal. Mar. 26, 2020) (noting that an average settlement award of $3,000.00 is significant for employees who typically earn $15.00–30.00 an hour).

While "a larger award was theoretically possible, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)). Nevertheless, given the low recovery rate, the court is skeptical that the unclaimed funds should be so quickly redistributed to a *cy-près* beneficiary. Instead, the parties should restructure the Settlement so that any unclaimed funds will be redistributed in a second, pro rata payout to the Class Members who claimed their awards after the first distribution of funds. This would ensure that the Class Members who decide to actively participate in the Settlement will receive a more adequate payment despite the Settlement's overall low recovery rate. Subject to this change, the court will preliminarily approve the settlement amount reflected in the proposed Settlement.

/////

1

  b.    *PAGA Penalties*

2

  The settlement also provides for $5,000.00 in civil PAGA penalties.  (Doc. No. 54-1 at

3

20.)  Pursuant to the PAGA, 75% of the civil PAGA penalties, or $3,750.00, will go to the

4

LWDA, and 25%, or $1,250, will be included in the Net Settlement Amount.  (*Id.*)  *See also* Cal.

5

Lab. Code § 2699(i).

6

  Plaintiffs' counsel initially estimated $800,000.00 in potential PAGA exposure.[8]  (Doc.

7

No. 54-1 at 36.)  After applying the generalized discounts described above, the value of the

8

PAGA claims was further discounted by the risks associated with obtaining an award of civil

9

penalties and the possibility that the court would exercise its discretion to award a lesser amount

10

than the maximum civil penalty allowed by PAGA.  (*Id.*)  *See also* Cal. Lab. Code § 2699(e)(2)

11

("[A] court may award a lesser amount than the maximum civil penalty amount specified . . . if

12

 . . . to do otherwise would result in an award that is unjust, arbitrary and oppressive, or

13

confiscatory.").

14

  The resulting $5,000.00 civil penalty represents 1.11% of the $450,000.00 Gross

15

Settlement Amount.  The amount proposed to settle plaintiff's PAGA claims is thus

16

proportionally consistent with other PAGA settlements approved by this court.  *See, e.g.*, *Castro*,

17

2020 WL 1984240, at *15 (approving $75,000.00 in PAGA penalties for a California class with a

18

$3,750,000.00 gross settlement fund); *Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017

19

WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving $100,000.00 in PAGA penalties for a

20

California class with a $3,950,000.00 gross settlement fund).  The court therefore concludes that

21

---

22

[8]  Plaintiffs appear to base their estimate on the decision in *Carrington v. Starbucks Corp.*, 30 Cal.

23

App. 5th 504, 529 (2018), a case where a California Court of Appeal affirmed a superior court's award of $5 in civil penalties for each initial violation of the PAGA in lieu of the $50 maximum

24

authorized for meal break violations.  There, the court reasoned that "this reduction was warranted because imposing the maximum penalty would be unjust, arbitrary, and oppressive based on Starbucks's 'good faith attempts' to comply with meal break obligations and because the

25

court found the violations were minimal."  *Id.* at 529.  However, this does not mean that plaintiffs

26

are entitled to base their estimate of potential PAGA exposure on one state trial court's exercise of discretion in one case.  The court will nevertheless reluctantly accept this estimate given the

27

parties' strenuous efforts to resolve their differences and settle this case.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (noting the "strong judicial policy that favors

28

settlements, particularly where complex class action litigation is concerned").

1   the settlement of plaintiff's PAGA claims is fair, reasonable, and adequate in light of the PAGA's

2   public policy goals. *See O'Connor*, 201 F. Supp. 3d at 1133.

3           c.      *Attorneys' Fees*

4           When a negotiated class action settlement includes an award of attorneys' fees, the district

5   court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is

6   reasonable, even if the parties have already agreed to an amount."[9] *Bluetooth*, 654 F.3d at 941;

7   *see also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted).

8   Where, as here, fees are to be paid from a common fund, the relationship between the class

9   members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Sec. Litig.*, 618

10  F.3d 988, 994 (9th Cir. 2010) (citation omitted). As a result, the district court must assume a

11  fiduciary role for the class members and "act with 'a jealous regard to the rights of those who are

12  interested in the fund' in determining what a proper fee award is." *Id.* (internal quotation marks

13  and citations omitted).

14          In evaluating the award of attorneys' fees, "courts have discretion to employ either the

15  lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations

16  omitted). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic

17  application of either method, where it yields an unreasonable result, can be an abuse of

18  discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir.

19  2002).

20          Under the percentage of the fund method, the court may award class counsel a percentage

21  of the common fund recovered for the class; in the Ninth Circuit, the benchmark is 25%. *Id.* at

22  1007, 1047–48; *see also Bluetooth*, 654 F.3d at 942. Special circumstances that could justify

23  varying the benchmark award include when counsel achieves exceptional results for the class,

24  undertakes extremely risky litigation, generates benefits for the class beyond simply the cash

25  settlement fund, or handles the case on a contingency basis. *See In re Online DVD-Rental*

26

27  [9] This requirement also flows from the court's obligation to review and approve any FLSA

28  settlements. *See Kerzich v. Cty. of Tuolumne*, No. 1:16-cv-01116-DAD-SAB, 2019 WL
    1755496, at *2 (E.D. Cal. Apr. 19, 2019) (listing cases).

*Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015).  An explanation is necessary when the court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000), but either way, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).

With the lodestar method, the court multiples the number of hours the prevailing party reasonably spent litigating the case by a reasonable hourly rate for counsel.  *Bluetooth*, 654 F.3d at 941.  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

The Ninth Circuit has recommended that district courts apply one method but cross-check the appropriateness of the determined amount by employing the other.  *See Bluetooth*, 654 F.3d at 944.  This diligence is particularly important "when counting *all* hours expended" in a case "where the plaintiff has achieved only limited success" would yield an "excessive amount" of fees, or when awarding a percentage of a "megafund would yield windfall profits for class counsel in light of the hours spent on the case." *Bluetooth*, 654 F.3d at 942 ("Just as the lodestar method can confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate, the percentage-of-recovery method can likewise be used to assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations omitted).  Similarly, an upward adjustment could be justified if the recovery is "too small . . . in light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Here, the settlement provides that class counsel will seek an award of $150,000.00, equivalent to 33.33% of the Gross Settlement Amount.  (Doc. No. 54-1 at 18–21.)  This is higher than the 25% benchmark for the Ninth Circuit, *Bluetooth*, 654 F.3d at 942, but not uncommon for wage-and-hour class actions in the Eastern District of California.  *See Barbosa*, 297 F.R.D. at 450 (listing cases where courts approved attorneys' fees of about one-third of the total settlement).

Plaintiffs' counsel contend that the requested attorneys' fees are "fair, adequate, and reasonable under the percentage of the fund approach," especially because "most 'plaintiffs'

26

1    attorneys' charge fees of 40% for contingency work." (Doc. No. 54-1 at 37.) They also argue

2    that they should be (1) "rewarded for achieving a valuable settlement without protracted

3    litigation," especially against "the caliber of opposing counsel" and while "bearing the substantial

4    burdens of contingency representation"; (2) recognized for their "previous experience in litigating

5    wage and hour class actions," which was "integral in evaluating the strengths and weaknesses of

6    the case" and the "reasonableness of the Settlement"; and (3) compensated for the "time, effort,

7    and money that they could have expended on less risky cases." (*Id.* at 37–42.) Finally, plaintiffs'

8    counsel assert that their request is also reasonable in light of the fact that the "lodestar exceeds

9    33.33%" of the Gross Settlement Account because of the "many hours [spent] litigating this

10   case." (*Id.* at 37.)

11        Although the court must disagree with plaintiffs' assertion that "the fees requested are

12   infinitely reasonable," (*id.*), especially in light of the low recovery rate and the repeated failures

13   to craft a satisfactory settlement, (*see* Doc. No. 34), it will, for the purposes of preliminary

14   approval, accept the justifications provided by plaintiffs' counsel for a measured departure from

15   the 25% benchmark. At the final approval stage, the court will carefully re-examine the award of

16   attorneys' fees and conduct a final lodestar cross-check. At that point, the court expects

17   plaintiffs' counsel to provide the requisite billing records and calculations underlying its assertion

18   that the lodestar exceeds a third of the Gross Settlement Amount.[10] *See Fischel*, 307 F.3d at

19   1006–07 & n.7, 1008 (noting that a district court has discretion to adjust a lodestar upward or

20   downward, including via a multiplier, based on certain reasonableness factors); *see Bluetooth*,

21   654 F.3d at 941–42 (same). Additionally, plaintiffs' counsel must provide an accounting for the

22   requested $25,000.00 in attorneys' costs at the final approval stage.

23        d.  *Incentive Payment*

24        While incentive awards are "fairly typical in class action cases," they are discretionary

25   sums awarded by the court "to compensate class representatives for work done on behalf of the

26   _____

27   [10] "Though the court may well grant an award of that size under certain circumstances, the court
     cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the
     method [of determining attorneys' fees] proffered by plaintiffs." *Perez v. All Ag, Inc.*, No. 1:18-
28   cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020).

1  class, to make up for financial or reputational risk undertaken in bringing the action, and,

2  sometimes, to recognize their willingness to act as a private attorney general." *W. Publ'g Corp.*,

3  563 F.3d at 958–59; *see also Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) ("[N]amed

4  plaintiffs . . . are eligible for reasonable incentive payments.").  Such payments are to be

5  evaluated individually, and the court should look to factors such as "the actions the plaintiff has

6  taken to protect the interests of the class, the degree to which the class has benefitted from those

7  actions . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and

8  reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (citation omitted).

9       Here, plaintiffs Maciel and Bonilla have each requested an incentive payment of

10  $7,500.00, for a total of $15,000.00.  (Doc. No. 54-1 at 46.)  According to plaintiff Maciel, he has

11  spent approximately 30 hours working on this case by

12  
13  
14  
15  
16  
17  
18  
19  
> obtaining legal counsel, speaking with my legal counsel on numerous occasions, both in person and over the phone, informing them of the terms and conditions of my coworkers' employment, assisting them in gathering information, identifying the claims brought in this case, gathering contact information for my former coworkers, gathering documents from my employment with Defendant, and participating in a full day of mediation.  I have also spent time carefully reviewing the Settlement, and other case related documents on my own and with my counsel to make sure that the Settlement and other work my attorneys performed are in the best interest of the class.  I have regularly contacted my counsel to follow the progress of the case.  Further, my counsel have advised me of the possibility that, if the case was lost, I could have been ordered to pay Defendant's costs and even attorneys' fees in this case, which could have been thousands of dollars by the end.

20  (Maciel Decl. at 455–56.)  In addition, plaintiff Maciel asserts that:

21  
22  
23  
> Because I filed this lawsuit, there is a public record at the Court showing that I brought a class action for unpaid wages against my former employer.  The payment to me of the enhancement award of $7,500.00 is not equal to the harm to my future career prospects that this case may cause me.

24  (*Id.* at 456.)  Plaintiff Bonilla avers similarly.  (*See* Bonilla Decl. at 465–66.)

25       According to plaintiffs, the average Class Claimant will receive $840.90, and the

26  minimum any Class Claimant will receive is $100.00.  (Settlement Agreement at 58; Class Notice

27  at 90; Doc. No. 54-1 at 21.)  Thus, an incentive award of $7,500.00 would be nearly nine times

28  the average amount a Class Claimant could expect to receive from the settlement.  Though this

1   figure is not necessarily excessive, *see, e.g.*, *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-

2   00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (approving an incentive

3   award of $7,500 to each class representative where average class recovery was approximately

4   $500), the Ninth Circuit has repeatedly urged district courts to be "vigilant in scrutinizing all

5   incentive awards to determine whether they destroy the adequacy of the class representatives."

6   *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (citation omitted).

7        Having reviewed the proposed $15,000.00 incentive award, the court notes that the

8   amount requested may be disproportionately high given the possible disparity with the

9   settlement's average and/or median award.[11]  Although the court will preliminarily approve the

10   incentive award in the amount sought, plaintiffs must demonstrate at the final approval stage that

11   the requested awards are commensurate with and do not inappropriately dwarf the awards

12   received by the Class Members.

13        e.  *Release of Claims*

14        In its previous order denying preliminary approval of the Third Amended Settlement, the

15   court rejected the provisions that would bind the Class Members to releasing the Released Claims

16   even if they did not submit a claim form.  (Doc. No. 34 at 13–16.)  In addition, the court raised

17   concerns about the discrepancy between the provisions specifying that the release of the FLSA

18   Claims would operate on an opt-in basis and the Class Notice, which failed to make that clear.

19   (*Id.* at 12.)

20        The parties have now amended the Settlement so that the Rule 23 portion of the

21   Settlement no longer requires a claim form and will operate on an opt-out basis, while the FLSA

22   portion of the Settlement will clearly operate on an opt-in basis.  (*See* Settlement Agreement at

23   59–60; Claim Notice at 90; Doc. No. 54-1 at 18–19.)  After reviewing the Released Claims, the

24   court concludes that they appropriately track the claims at issue in this case and that the terms

25   governing their release are consistent with applicable caselaw.

26

27   _____

    [11]  Plaintiffs have provided the court with the minimum and average award expected from the
28   Settlement, but they have not provided estimates regarding the expected median or maximum
    awards.  Plaintiffs are directed to do so at the final approval stage.

1    **D.    Proposed Class Notice and Administration**

2         For proposed settlements under Rule 23, "the court must direct notice in a reasonable

3    manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see*

4    *also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement

5    under Rule 23(e)."). For a class certified under Federal Rule of Civil Procedure 23(b)(3), the

6    notice must contain, in plain and clear language: (1) the nature of the action; (2) the definition of

7    the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to

8    appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the

9    time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on

10   members of the class. Fed. R. Civ. P. 23(c)(2)(B).

11        A class action settlement notice "is satisfactory if it generally describes the terms of the

12   settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

13   forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)

14   (internal quotation marks and citations omitted).

15        For proposed settlements under the FLSA, "the court [must] provide potential plaintiffs

16   'accurate and timely notice concerning the pendency of the collective action, so that they can

17   make informed decisions about whether or not to participate.'" *Adams v. Inter–Con Sec. Sys.*,

18   242 F.R.D. 530, 539 (N.D. Cal. 2007) (quoting *Hoffmann–La Roche v. Sperling*, 493 U.S. 165,

19   170 (1989)); *see generally* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any

20   such action unless he gives his consent in writing to become such a party and such consent is filed

21   in the court in which such action is brought.").

22        In addition, "courts considering approval of settlements in these hybrid [Rule 23 and

23   FLSA] actions consistently require class notice forms to explain: '(1) the hybrid nature of th[e]

24   action; [] (2) the claims involved in th[e] action; (3) the options that are available to California

25   Class members in connection with the settlement, including how to participate or not participate

26   in the Rule 23 class action and the FLSA collecti[ve] action aspects of the settlement; and (4) the

27   consequences of opting-in to the FLSA collective action, opting-out of the Rule 23 class action,

28   or doing nothing.'" *Thompson v. Costco Wholesale Corp.*, No. 14-cv-2778-CAB-WVG, 2017

1   WL 697895, at *8 (S.D. Cal. Feb. 22, 2017) (quoting *Pierce v. Rosetta Stone, Ltd.*, No. 4:11-cv-

2   01283-SBA, 2013 WL 1878918, at *4 (N.D. Cal. May 3, 2013)).

3          Here, the Settlement provides that defendant will provide the Settlement Administrator

4   with a list of Class Members "containing names, social security numbers, dates of employment,

5   number of pay periods worked, last-known addresses and phone numbers." (Doc. No. 54-2 at

6   104.)  The Settlement Administrator will then send the Class Notice and Opt-Out Request (the

7   "Initial Mailing") to each Class Member using first-class mail.  (*Id.*)  Within 28 days, the

8   Settlement Administrator will determine whether any Initial Mailing was returned as

9   undeliverable.  (*Id.*)  If so, the Settlement Administrator will perform skip-tracing via either a

10   search of the National Change of Address database and/or a search using Experian to conduct a

11   second mailing.  (*Id.*)  If an Initial Mailing is not returned as undeliverable within 28 days, the

12   Settlement Administrator will assume that it was delivered properly.  (*Id.*)

13          The court has several concerns with the Class Notice as proposed.  First, it appears that it

14   will only be distributed in English.  However, plaintiff Maciel appears to speak only Spanish, (*see*

15   Maciel Decls. at 450–53; 471–73), and it is likely that many of the Class Claimants may face

16   difficulties in understanding a Class Notice provided only in English.  Accordingly, the parties

17   must revise the Class Notice to ensure that any mailings are sent in both English and Spanish.

18   Second, there is a discrepancy in the Class Notice as to the expected Settlement Administration

19   cost.  Although the Class Notice explains that Settlement Administration costs will not exceed

20   $6,000.00, the parties have represented to the court that the Settlement Administration costs are

21   estimated at $6,500.00.  The parties are directed to clarify this discrepancy.  Third and finally, the

22   parties must revise the Class Notice to include details about the second distribution of funds

23   ordered by the court in the event that any Class Members decide to opt-out or otherwise fail to

24   deposit their settlement checks.  Accordingly, the court must withhold approval of the proposed

25   Class Notice until the above changes are made.

26   **E.      Settlement Administrator and Settlement Administration Costs**

27          The parties have agreed to retain Simpluris, Inc. ("Simpluris") to handle the notice and

28   claim administration process and request that Simpluris be appointed to serve as the Settlement

Administrator.  (Doc. No. 54-1 at 48.)

The estimated cost of administering this settlement is $6,500.00, which will be deducted from the Gross Settlement Amount.  (Settlement Agreement at 65–69; Doc. No. 54-1 at 18–21.) This estimate is proportionally consistent with other settlements approved by this court.  *See, e.g.*, *CoreCivic of Tennessee*, 2020 WL 1475991, at *14 (administration costs of $15,000.00 for a $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.*, No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000.00 for a $25 million settlement); *Aguilar*, 2017 WL 117789, at *7 (administration costs of $45,000.00 for a $4.5 million settlement).

Accordingly, the court will appoint Simpluris as the Settlement Administrator.

**F.  Implementation Schedule**

Plaintiff has submitted the following implementation schedule:

| Event | Date |
|---|---|
| Deadline for defendant to provide Simpluris with a list of Class Members ("Class List") | No later than fourteen (14) days after entry of Preliminary Approval Order |
| Deadline for Simpluris to send the Initial Mailing to each Class Member | No later than fourteen (14) days after receipt of the Class List |
| Deadline to conduct additional searches for Class Members whose Initial Mailings were returned as undeliverable | Within twenty-eight (28) days of the Initial Mailing |
| Deadline to file any Objections, Opt-Out Request, or Pay Period Disputes | No later than forty-five (45) days after the Initial Mailing (the "Response Deadline") |
| Deadline to compile and submit to the Parties a report of 1) the number of Class Members who opted out and 2) the final individual settlement amounts due to each Class Claimant | No later than seven (7) days prior to the Final Approval Hearing |
| Deadline for recipients to cash their settlement checks | One-hundred-twenty days (120) after the date of mailing or remailing, recipients will receive a letter noting that the check will be cancelled within thirty (30) days if not cashed |
| Deadline for the *cy-près* beneficiary to receive funds | After each settlement check is cancelled |
| Final Approval Hearing | May 5, 2020 |

(*See* Docs. No. 54-1 at 22, 48; 54-2 at 104–05.)

The court has identified several deficiencies relating to the proposed implementation schedule.  First, it is unclear what deadline applies to sending out new Claim Notices after any Initial Mailings are returned as undeliverable, and what deadline applies to any responses submitted in response to the re-mailed Claim Notices.  The currently proposed schedule merely requires the Settlement Administrator to determine whether any Class Notice was returned as undeliverable within twenty-eight days of the Initial Mailing.  Second, the implementation schedule should reflect the second distribution of funds ordered by the court.  Finally, the Final Approval Hearing date requested by the parties has now passed.  Upon approval of a new implementation schedule, the court will select and schedule a new Final Approval Hearing date consistent with the court's availability.  Until the above changes are made, the court cannot approve the parties' implementation schedule.

## CONCLUSION

Accordingly:

1.    Plaintiffs' motion for preliminary approval of class action settlement (Doc. No. 54) is conditionally granted;

a.    The proposed class and FLSA collective are certified for settlement purposes;

b.    Plaintiffs' counsel, David G. Spivak of The Spivak Law Firm and Eric B. Kingsley of Kingsley & Kingsley, APC, are appointed as class counsel for settlement purposes;

c.    The named plaintiffs, Jose Maciel and Elvis Bonilla, are appointed as class representatives for settlement purposes;

d.    Simpluris is approved as the settlement claims administrator;

2.    In order to proceed with preliminary approval of the Settlement, the parties are directed to:

a.    Amend the Settlement to include a second, pro rata distribution of any unclaimed funds to the Class Claimants before any remaining unclaimed

funds are distributed to the *cy-près* beneficiary;

       b.     Submit the revised Settlement to the LWDA for comment and provide documentation to the court thereof;

       c.     Revise the Claim Notice to include a Spanish translation and the changes noted above; and

       d.     Update the implementation schedule as ordered.

3.     The revised portions of the Settlement are to be submitted to the court no later than thirty (30) days from the date of service of this order.

IT IS SO ORDERED.

Dated:   **August 28, 2020**                                                     
                                            UNITED STATES DISTRICT JUDGE